UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FREDRICK SCHOLTISEK,
on behalf of himself and all other employees similarly
situated, et al.,

                              Plaintiffs,

                                                    <u>DECISION AND ORDER</u>

                                                    03-CV-6656L

              v.

ELDRE CORPORATION,


                              Defendant.
_____


        Plaintiff, Fredrick Scholtisek, commenced this action against his former employer, Eldre

Corporation ("Eldre"), alleging that Eldre has violated the Fair Labor Standards Act ("FLSA"), 29

U.S.C. § 201 et seq., and the New York Labor Law by willfully making impermissible deductions

from his pay and that of other employees who are paid on a salary basis.  The complaint seeks

declaratory relief and money damages, on behalf of Scholtisek and all other similarly situated

employees.  Plaintiff has demanded a trial by jury.

        The Court has previously certified this action as a class action under Rule 23(b)(3) of the

Federal Rules of Civil Procedure, and directed that notice of plaintiff's claims be sent to all class

members, pursuant to Rule 23 and 29 U.S.C. § 216(b).  229 F.R.D. 381 (W.D.N.Y. 2005).  The class

consists of all individuals who are or were employed by Eldre on or after December 27, 1997, and

who were classified as "exempt" or salaried employees for purposes of overtime pay. To date, forty-four current and former employees of Eldre have submitted consent forms indicating their desire to participate as plaintiffs in this action. Forty-seven putative class members have also opted out of this action.

Both sides have now moved for summary judgment. For the reasons that follow, plaintiffs' motion is granted in part and denied in part, and defendant's motion is granted in part and denied in part.

**DISCUSSION**

### I. General Principles

Under the FLSA, an employee who works more than forty hours per week must be compensated for each hour worked over forty "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). "[E]mployee[s] employed in a bona fide executive, administrative, or professional capacity," however, are exempt from the FLSA's overtime requirements. 29 U.S.C. § 213(a)(1). Those three categories of employees are defined in regulations promulgated by the Secretary of Labor. *See* 29 C.F.R. §§ 541.100, 541.200, 541.300.

In the case at bar, Eldre contends that most of the plaintiffs were properly classified, and treated, as exempt professional employees, and that they are therefore not entitled to payment of overtime. In order to meet the criteria for the "professional" exemption, an employee must satisfy both a "salary basis" test and a "duties test." *See* 29 C.F.R. §§ 541.2; *Auer v. Robbins*, 519 U.S. 452,

455 (1997); *Coleman-Edwards v. Simpson*, 330 Fed.Appx. 218, 219 (2d Cir. 2009). With regard to the former, "[a]n employee will be considered to be paid on a 'salary basis' ... if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602.

To meet the "duties test" for a professional employee, the employee must be "someone '[w]hose primary duty consists of the performance of [w]ork requiring knowledge of an advance[d] type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study.'" *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 205 (2d Cir. 2009) (quoting 29 C.F.R. § 541.3(a)(1)). "If a job does *not* require knowledge customarily acquired by an advanced educational degree ... then, regardless of the duties performed, the employee is not an exempt professional under the FLSA." *Id.* at 206.

"Because the FLSA is a remedial statute, this exemption must be 'narrowly construed.'" *Id.* at 204 (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)). The burden is on the employer to prove that the employee clearly falls within the terms of the exemption. *See Havey v. Homebound Mortgage, Inc.*, 547 F.3d 158, 163 (2d Cir. 2008); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 370 (7th Cir. 2005). *See also Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531 (2d Cir. 2009) ("Exemptions from the FLSA's requirements 'are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit'") (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

- 3 -

For purposes of the present motions, the chief area of dispute centers around the salary basis test. Plaintiffs contend that although Eldre classified them as exempt, Eldre has engaged in certain practices, and maintained certain policies, that are inconsistent with an intent to pay employees on a salary basis.

"In *Auer v. Robbins*, the Supreme Court adopted the Secretary of Labor's view that the salary basis test denies 'exempt status when employees are covered by a policy that permits disciplinary or other deductions in pay "as a practical matter." That standard is met ... if there is either an actual practice of making such deductions or an employment policy that creates a "significant likelihood" of such deductions.'" *Kelly v. City of Mount Vernon*, 162 F.3d 765, 768 (2d Cir. 1998) (quoting *Auer*, 519 U.S. at 461); *accord Coleman-Edwards*, 330 Fed.Appx. at 220 (quoting *Auer*, 519 U.S. at 461). The Court in *Auer* also concluded that a "one-time deduction ... under unusual circumstances" is not enough to establish a significant likelihood of such deductions. 519 U.S. at 462.

In the case at bar, plaintiffs allege that Eldre both engaged in an actual practice of making unlawful deductions, and maintained a policy that created a significant likelihood of such deductions. Specifically, plaintiffs allege that Eldre had a practice of docking its nominally exempt employees in partial day increments, and a practice of instructing exempt employees not to report to work on certain days due to employer-imposed "plant shutdowns," and then reducing those employees' weekly pay accordingly. Plaintiffs also allege that Eldre's policy of not paying employees at all for days when they were absent for more than three hours created a significant likelihood of unlawful pay deductions.

The gist of plaintiffs' claims, then, appears to be not so much that they are exempt, salaried employees who should have been, but were not, paid their full salaries without regard to how many hours they actually worked; rather, they allege that although they were classified as exempt, Eldre in fact treated them like hourly employees, by docking their pay for time when they were absent from work, so that they should have been paid overtime when they worked more than forty hours a week. *See* Complaint ¶ 30 ("Defendant's policy and practice is not to ensure that it pays overtime according to the law"); *see also* 29 C.F.R. § 541.603(a) (stating that "[a]n employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis," and that "[a]n actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis").[1] Apparently, more often than not, plaintiffs did work over forty hours per week, since Eldre's handbook for exempt employees states that a "salaried employee is required to work 45 hours per week on the basis of 9 hour minimum work days, Monday through Friday." Dkt. #183 Ex. N at 7; Ex. O at 5.

Eldre contends that even if the Court denies its motion for summary judgment, plaintiffs are not entitled to summary judgment because there are genuine issues of material fact concerning whether and to what extent impermissible deductions were made from their pay. Defendant also contends that even if the proof shows that such deductions were made, Eldre is entitled to summary judgment in its favor because it may avail itself of the "window of correction" afforded by 29 C.F.R.

---

[1]At oral argument, the Court also sought to clarify that plaintiffs' claim was that they "were really something other than what they were categorized as [by Eldre]," to which plaintiffs' counsel responded, "Certainly," adding that "there's definitely overtime damages" and that "[t]hey've definitely worked well above and beyond the 40 hours per week limit." Tr. at 10.

§ 541.603(c). That regulation provides that "[i]mproper deductions that are either isolated or inadvertent will not result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions."[2]

## II. Partial Day Absences

Plaintiffs assert that the undisputed evidence establishes that from 1998 up until 2004, Eldre engaged in an actual practice of docking the salaries of exempt employees for partial day absences. In other words, if an ostensibly salaried employee missed part of a day, that employee was not paid for the time that he was absent.

As stated, the regulations provide that "[a]n employee will be considered to be paid on a 'salary basis' ... if the employee regularly receives each pay period ... a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or *quantity* of the work performed." 29 C.F.R. § 541.602(a). Docking an employee's pay to reflect a partial day absence is not consistent with an intent to pay the employee on a salary basis under that test. *See Renfro v. Indiana Michigan Power Co.*, 370 F.3d 512, 516 (6th Cir. 2004) ("when an employer actually deducts from an employee's paycheck [because of a partial day absence] the employee is ineligible for the exemption" for salaried employees); *accord Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 265 (5th Cir. 2000); *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 534 (7th Cir. 1999); *Torres v. Gristede's Operating Corp.*, 628 F.Supp.2d 447, 457 n.6 (S.D.N.Y. 2008); *see also Friedman v. South Florida Psychiatric Associates,*

---

[2]A similar provision was previously set forth at 29 C.F.R. § 541.118(a).

*Inc.*, 139 Fed.Appx. 183, 185 (11th Cir. 2005) (stating that "[t]he evidence that Friedman's pay was docked for partial days' absences was undisputed," and that therefore "the salary basis of pay was violated, and Friedman was rendered a non-exempt employee and was entitled to overtime").

In response to plaintiffs' motion, Eldre contends, first, that there was no formal policy providing for partial day deductions, second, that if such deductions did occur, it happened very infrequently, and third, that there are genuine issues of fact concerning these matters. Eldre also asserts that even if plaintiffs can show that such deductions occurred, Eldre is entitled to summary judgment by virtue of the "window of correction" defense.

At their depositions in this case, Eldre's Human Resources Manager Debbie Kaufman and her predecessor, Kathleen Davis, both testified about this matter. Kaufman, who began working at Eldre in April 2001, testified that one of her job duties was to process Eldre's payroll. Dkt. #183 Ex. F at 20, 24. She was trained in that job by Davis, whom Kaufman replaced as Human Resources Manager in the fall of 2003. Kaufman stated that at the time of her deposition in February 2005, she "ha[d] a person who [wa]s doing the mechanics of payroll," but that she was "still in charge of payroll." *Id.* at 27-30.

At her deposition, Kaufman was asked what would happen if a salaried employee wanted to take off part of a day, but had no leave time to use for the time off. She answered that she "would have to pay him for the entire day." *Id.* at 81. When asked whether there was "ever a point where [she] wouldn't pay him for the entire day," she replied:

A. Yes.

Q. When was that point?

A. When I was told not to.

Q. And for what period of time were you told not to?

A. When Kathleen [Davis] was there.

Q. Okay. So through fall of 2003?

A. Yeah.

*Id.* at 81.  Kaufman also stated that she continued to follow that practice following Davis's departure from Eldre, up until about "[s]ix, nine months" prior to her deposition (*i.e.*, sometime between May and August 2004), when she was told by Eldre's Vice President for Finance Thomas Giuliano "to pay the person" in those circumstances, in order to avoid any "legal problems ... ."  *Id.* at 82.

Kaufman was also asked if she could estimate "how many times someone who is classified as exempt may not have gotten paid for part of a day that he or she worked" during her entire employment at Eldre.  She responded, "It was very little," adding that while she could not give a precise number, "[i]t was very far and few between."  *Id.* at 87.

At her deposition, Kaufman was also shown some Eldre employee time cards and pay records, from which she testified that she would be able to determine whether a given employee had received less than a full week's salary for certain weeks.  She indicated that on some occasions, it did appear that certain employees had been paid less than their full weekly salaries when they had missed part of a day.  For example, Kaufman testified that the records showed that during one particular week, employee Martin Melich had missed half a day, and that instead of being paid his usual salary of $550 for that week, Melich received ninety percent of that amount, *i.e.*, $495.  *Id.* at 134-36.

Davis was also deposed during this litigation. Like Kaufman, she stated that on occasion, an exempt employee who was at work for only part of a day would not get paid for the time that he missed, though she added that "it was very infrequent" that this would occur. Dkt. #183 Ex. K at 36.

Davis stated, however, that at one point, she "had an employee get angry because their pay was docked" (presumably because of a partial day absence), and so Davis went to see Executive Vice President Arthur Abelson about the matter. Davis testified that she "wanted to get an answer to have something to say to this employee to hopefully make them understand that this was company policy and, you know, that was it." *Id.* at 45. Davis told "Mr. Abelson that [she did]n't recall seeing a policy like that before [*i.e.*, during her previous employment at other companies] for a salaried employee," *id.* at 44, and Abelson responded that "the handbook [setting forth the policy] had been gone over by the company attorneys and ... everything in it was legal." *Id.* at 45.[3]

Aside from that one employee, Davis testified that she could not recall anyone else complaining about this policy, adding, "if it happened, it happened so rarely." *Id.* at 51. She did state, however, that Eldre's employees were made aware of the policy. *Id.* at 52.

_____

[3]It does not appear that the handbook explicitly stated that employees' pay would be docked for partial day absences. *See* Dkt. #183 Exs. N, O. The handbook stated that if an exempt employee were absent for less than three hours in a given day, "there is no loss of pay," but that "once absent for more than three (3) hours, the employee cannot and will not be allowed to come to work. The employee will not be paid for the entire day." Dkt. #183 Ex. N at 11, Ex. O at 9. That stated policy is the subject of another one of plaintiffs' claims, but on its face, it gives no indication that employees would be docked for *partial* day absences. Davis testified that the partial day deduction policy had been orally conveyed to her by one of Eldre's officers, although she could not remember exactly whom. Dkt. #183 Ex. K at 101.

In light of this testimony, I am not persuaded by Eldre's contention that there are genuine issues of fact concerning whether there was any policy or practice with respect to partial day deductions, nor do I believe that Eldre should be permitted to avail itself of the "window of correction" defense in this regard. The evidence establishes as a matter of law that there was an actual practice of making such deductions. Plaintiffs are therefore entitled to summary judgment on this claim.

Though Davis and Kaufman stated that partial day deductions were infrequent, there is no indication from their testimony that those deductions were inadvertent. To the contrary, both Davis and Kaufman made it quite clear that, up until some time after the commencement of this lawsuit, such deductions were called for under well known, if unwritten, company policy at Eldre, and that they actually occurred, pursuant to that policy.

That these deductions may have been infrequent does not mean that there was no actual practice in that regard, or that the deductions were the result of some mistake or inadvertence. *See*, *e.g.*, *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 617 (2d Cir. 1991) (employer was not entitled to invoke "window of correction," even though only 24 of approximately 400 employees in question actually had amounts deducted from their paychecks for partial day absences, since evidence showed that those deductions were made pursuant to company policy, and were not one-time or inadvertent deductions), *cert. denied*, 506 U.S. 905 (1992). The purpose of the window of correction is to allow employers to correct, and thereby avoid liability for, violations that are the result of a mistake, *not* due to company policy. *See Yourman v. Giuliani*, 229 F.3d 124, 128 (2d Cir. 2000) ("the window of correction is not available if an employer engages in a practice of making impermissible

deductions in its employees' pay, or has a policy that effectively communicates to its employees that such deductions will be made") (internal quotation marks omitted), *cert. denied*, 532 U.S. 923 (2001).

In addition, Davis's statement about "it happen[ing] so rarely" was in response to a question about whether she could "think of any other occasion when an employee complained about getting docked for a partial day [absence]." *Id.* at 51. Read in context, then, her statement that it "happened ... rarely" referred not to the deductions themselves, but to her fielding *complaints* about the policy from Eldre employees. The test, however, is not how often employees complained about the deductions, but whether, how often, and why the deductions occurred in the first place. *See Kennedy*, 410 F.3d at 372 ("If the employees can show that the deductions were not merely happenstance, but a routine practice or company policy, the employer may not rely on the margin of error tolerated by the [window of correction] regulation").

Finally, I am unpersuaded by Eldre's contention that there could be other explanations for some of the time cards reflecting that employees' pay had been docked for half a day.[4] Even if not every instance of docking was due to the employee's absence for part of a day, the evidence clearly shows that there was an actual practice in effect at Eldre of docking nominally exempt employees' pay for partial day absences.

---

[4]Eldre contends, for example, that an employee might have been absent for an entire day (and therefore not entitled to any pay for that day, *see* 29 C.F.R. § 541.602(b)(1) (providing that "[d]eductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons, other than sickness or disability"), but chose to use a half day's leave time to cover half of that absence. That speculative assertion, even if true, would not alter the fact, as demonstrated by the undisputed evidence, that Eldre did engage in a policy of docking employees for partial day absences.

The federal regulations provide that "[i]f the facts demonstrate that the employer has an actual practice of making improper deductions, the exemption is lost during the time period in which the improper deductions were made for the employees in the same job classification working for the same managers responsible for the actual improper deductions." 29 C.F.R. § 541.603(b).[5] *See also De Los Santos v. Just Wood Furniture, Inc.*, No. 05-cv-9369, 2009 WL 1616497, at *6 (S.D.N.Y.

_____

[5]That regulation took effect on August 23, 2004. Prior to that date, the effective regulation, 29 C.F.R. § 541.118(a)(6), provided that "[t]he effect of making a deduction which is not permitted under these interpretations will depend upon the facts in the particular case," and that

> [w]here deductions are generally made when there is no work available, it indicates that there was no intention to pay the employee on a salary basis. In such a case the exemption would not be applicable to him during the entire period when such deductions were being made. On the other hand, where a deduction not permitted by these interpretations is inadvertent, or is made for reasons other than lack of work, the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future.

In adopting the new regulation in 2004, the United States Department of Labor explained that the "new rule represent[ed] a departure from the Secretary[ of Labor]'s position in *Auer*," by making clear that a "significant likelihood" of improper deductions will not in itself cause the employer to lose the exemption. 69 Fed. Reg. at 22,180. Under the 2004 regulation, only "an employer who has an *actual practice* of making improper deductions will lose the exemption during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions." *Id.* (emphasis added).

In *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 629 (6th Cir. 2009), the Court of Appeals for the Sixth Circuit held that where the plaintiffs' claims straddle the effective date of the amended regulation, "[t]he proper approach is to apply *Auer's* salary-basis test to pay periods occurring before August 23, 2004 and to apply § 541.603 to pay periods occurring after the same, § 541.603's effective date." These changes in the regulations have no effect on plaintiffs' claims in the case at bar concerning unlawful partial day deductions, however, since those claims are based on Eldre's actual practice of making such deductions. Under both the old and new regulations, then, Eldre would lose the exemption for pay periods in which it engaged in an actual practice of making improper deductions.

Jan. 14, 2009) ("In general, if impermissible deductions are taken from an exempt employee's paycheck, the employee becomes non-exempt") (citing § 541.603(b)).

In the case at bar, it is clear that Eldre has maintained such an actual practice during at least some of the period covered by this lawsuit. Thus, Eldre loses the exemption for the employees in the affected job classifications during periods in which the improper deductions were made. 29 C.F.R. § 541.603(b).

On the record before me, however, the Court cannot determine as a matter of law during what periods those improper deductions did occur, the extent to which they occurred, exactly which employees or job classifications were affected by this practice, or the number of hours for which plaintiffs are entitled to overtime pay. The amount of damages therefore remains to be decided. *See Torres*, 628 F.Supp.2d at 462 n.14 (granting summary judgment for employees on issue of liability, based on evidence of employer's practice of making improper deductions, but adding that "[a]t this time, the Court does not resolve the amount of damages owed to co-manager class members, which can be set after additional proceedings") (citations omitted).

## III. Plant Shutdowns

Plaintiffs also allege that Eldre maintained an actual practice of declaring "partial week shutdowns" and then docking the salaries of supposedly exempt employees for days on which they had been instructed not to report to work. Plaintiffs contend that this runs afoul of the principle that

> [a]n employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business. If the employee is ready, willing and able to work, deductions may not be made for time when work is not available.

29 C.F.R. § 541.602(a) (previously codified at 29 C.F.R. § 541.118(a)(1)).

In support of this claim, plaintiff Scholtisek states in his affidavit (Dkt. #174) that "around holidays, such as Thanksgiving, the Fourth of July and Labor Day[,] Eldre would tell exempt employees that the company was having a shutdown and [that the employees were] not to report to work." He states that Eldre would then "force [the 'exempt' employees] to use vacation time or not pay [them] at all for the time [Eldre] told [the employees] to miss." *Id.* ¶ 10.

Plaintiffs have also submitted copies of Eldre employee time cards from certain holiday weeks in 2001 and 2002, indicating that some employees did not report to work during those weeks. The reasons given on the time cards for those absences vary, however. Some time cards indicate that one day during the week was a holiday, and the other four weekdays are listed as "No Pay - Shut Down," "Unpaid," "Closed," and the like. Dkt. #189-4. Other time cards show that the employee used vacation time for some or all of the balance of the workweek. Still other time cards appear to show that the employee did report to work for the four days other than the holiday. *Id.*

Besides Scholtisek's testimony, the other deposition testimony concerning these alleged shutdowns is less than clear about how often and for how long they occurred, and what effect they had on exempt employees' pay. Eldre Vice President Lee Moss testified that at times, certain departments within Eldre might shut down for a time, "for maintenance or for economic reasons," and that when that occurred, some or all of the employees in that department would not report to work during the shutdown. Dkt. #175-4 at 50-51. He explained that sometimes, if the reason for the shutdown was that there was not enough work for them to do, employees would be asked if they wanted to take the time off voluntarily. If enough employees indicated that they did, there might be

enough work for the remaining employees in the department to allow them to come in to work, so that the department would not have to shut down completely, or prevent employees who wanted to work from doing so. *Id.* at 50.

Moss testified that the shortest such shutdown period that he could recall was one week. *Id.* at 49. He stated that he did not recall whether exempt employees were ever directed not to report for only part of a week due to a plant shutdown, but that it was "possible" that this might have occurred. *Id.* at 52. Moss does not appear to have testified how that would have affected exempt employees' pay.[6]

When Kaufman was asked at her deposition whether, "since April of 2001, every time there's been a shutdown, that exempt employees were told not to come in for the entire week," she responded, "[a]s far as I know, yes." Dkt. #183 Ex. F at 109. She explained that she might not have been aware if "[a] supervisor [told] them something different," and she agreed that it was possible that at times, Eldre "supervisors [might] tell [exempt] employees to come in for all or part of a week, unbeknownst to [her]." *Id.*

Davis testified that during the roughly five and a half years that she worked at Eldre, "there were probably a couple, maybe three" plant shutdowns, although she was not sure of the exact number. Dkt. #183 Ex. K at 65. When asked whether "exempt employees [would] sometimes go in for part of the week during a shutdown but not the remainder of the week," Davis answered, "They weren't allowed to. I mean, if your supervisor had work for you and requested you to be

---

[6]Moss also stated that if the shutdown was occasioned by a need to perform maintenance or repair work in the affected department, exempt employees would not be prohibited from coming to work, but would be encouraged to report, so that they could oversee the maintenance work. Dkt. #183 Ex. H at 53-54.

there, that was different; but you didn't make the decision yourself I'm going to go into the office, no." *Id.* at 66.

When asked to clarify that answer, Davis testified that she did not recall any times when employees were told to report for only part of a week, but not to report for the remainder of the week due to a plant shutdown. Like Kaufman, though, Davis said that she "wouldn't have been someone that would have known who was going to be working and who wasn't." *Id.* She stated, however, that if an exempt employee did come in to work for only one or two days in a given week, the employee would not be paid for the remainder of the week unless he could cover the missed days with vacation or other personal time. *Id.* at 67.

Even viewing this evidence in the light most favorable to plaintiffs, I conclude that it fails to give rise to any genuine issue of material fact with respect to whether exempt employees' pay was unlawfully docked for partial week shutdowns. I therefore grant Eldre's motion for summary judgment on this claim.

Under the regulations, "an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. *Exempt employees need not be paid for any workweek in which they perform no work*." 29 C.F.R. § 541.602(a) (previously codified at 29 C.F.R. § 541.118(a)) (emphasis added).[7]

As the preceding recitation shows, however, the evidence does not support plaintiffs' allegation that there were partial week shutdowns in which nominally exempt employees were paid

---

[7]The regulation provides that the general prohibition against paying exempt employees less than their full salary for weeks in which they perform any work is "[s]ubject to the exceptions provided in paragraph (b) of this section," relating to full day absences for personal reasons; *see* n.4, *supra*.

only for the days on which they were called in to work. Scholtisek himself testified that, although he had previously stated in an affidavit that he suffered a reduction in his salary during Thanksgiving week 1999, the payroll records showed otherwise. After reviewing those records, Scholtisek stated, "Oh, it appears that I got it. I received it," *i.e.*, his full salary for that week. Dkt. #183 Ex. L at 8. He conceded that his prior statement about his salary being docked for that week was incorrect. *Id.*

Moss testified that he did not recall any shutdowns lasting less than a week. His statement that it was "possible" that exempt employees *might* have been instructed to report for only part of a week due to a plant shutdown is hardly evidence that such an event *did* occur, particularly given the paucity of other evidence in that regard

Nor does Kaufman's testimony support this claim. Again, Kaufman stated that as far as she was aware, every time a shutdown occurred, exempt employees were told not to come into work at all for that entire week. Similarly, Davis testified that she could not recall a single occasion in which employees were told to report for only part of a week due to a plant shutdown.

In any event, both Kaufman and Davis indicated that they would not have known whether a supervisor had instructed employees to report for less than a full week. As with Moss's testimony, that does not tend to show that such an event ever did happen. Davis's testimony that an exempt employee who worked for part of a week would be paid for less than the entire week, unless he had vacation time in his leave bank, was not an indication that such practices did occur, but was in response to a hypothetical question that had no factual foundation in the record.

In support of this "shutdown" claim, plaintiffs' attorney also states in his affirmation that based on a review of Eldre records, it appears that there have been seven partial week shutdowns at Eldre from July 2001 through August 2003, which resulted in pay deductions affecting anywhere from six to twenty-seven exempt Eldre employees. Dkt. #175 ¶ 12. Plaintiffs' counsel does not state exactly how he arrived at that conclusion, however, nor has he demonstrated how "a review of Eldre's documents" shows that such shutdowns and pay deductions occurred. Since "[a]n attorney's affidavit that is not based on personal knowledge carries no weight ...," *Strine v. Marion Central Sch. Dist.*, 280 F.Supp.2d 75, 79 n.3 (W.D.N.Y. 2003), these assertions have no probative value. *See also United States v. Maldonado-Rivera*, 922 F.2d 934, 972 (2d Cir. 1990) ("The [district] court properly declined to credit the attorney's affidavit because it was not based on the attorney's personal knowledge").

The time cards submitted by plaintiffs likewise add nothing to their claim. Plaintiffs' Exhibit J (Dkt. #189-4) comprises over fifty time cards dating from holiday weeks in 2001 and 2002. Those time cards do, in general, show that during the weeks in question, the employees did not report to work at all. They either took vacation or other leave time for the non-holiday days, or they were not paid for those days due to a plant shutdown. Not one of the time cards, however, appears to reflect a single instance in which an employee worked for part of the week, but was prevented from working the entire week. Likewise, there is no indication that any employee worked part of the week, and was paid only for the days on which he or she worked.

In assessing this evidence, the Court recognizes a degree of tension between the regulation providing that deductions may not be made from the salary of an exempt employee who "is ready,

willing and able to work," but who is prevented from working because the employer has no work available, and the regulation providing that "an employee need not be paid for any workweek in which he performs no work." Here, it appears that on some occasions, there were weeks during which Eldre employees performed no work (and received no pay, other than one day of holiday pay), due to an employer-imposed shutdown.

Neither side here has cited any case law directly on point, but the Court has found one case, *Hagadorn v. M.F. Smith & Associates, Inc.*, 172 F.3d 878 (table), 1999 WL 68403 (10th Cir. 1999), in which the Tenth Circuit held that the fact that the employer did not pay the plaintiff at all for the weeks in which she was furloughed due to the employer's lack of work did not mean that the plaintiff was not paid on a salary basis. The court held that "the district court correctly found this situation governed by ... the general rule that an employee need not be paid for any workweek in which he performs no work." 1999 WL 68403, at *4, n.2 (internal quotation marks omitted).

I concur with the *Hagadorn* court's reasoning. The regulations establish a general principle–that an exempt employee's pay should not be docked where the employer prevents the employee from working–but also provide that under one particular set of circumstances, *i.e.*, when the employee does not work at all for an entire week, the employee need not be paid. Applying that reasoning here, I conclude that the fact that some plaintiffs may not have received a full week's salary for some weeks in which a holiday fell (or were required to use vacation time for the other days, if they wanted to be paid for those days) neither violated the FLSA or its implementing regulations, nor did it render those plaintiffs non-exempt. Although the plaintiffs may have gotten paid for one day, *i.e.*, the holiday, during the weeks in question, the fact is that they did not perform

- 19 -

any work during those weeks. They were therefore not entitled to be paid for the non-holiday balance of those weeks.

Plaintiffs have identified one item of evidence indicating that one employee was subjected to a shutdown of less than one week. Plaintiffs have submitted an undated timecard of one Eldre employee for a particular week, with the following entries for Monday through Friday: "Present"; "Present"; "Holiday"; "Unpaid Shutdown"; "Unpaid Shutdown." Dkt. #175-9 at 4. It is not clear who this employee was, if the employee was classified as exempt, when this occurred, or what the circumstances were. That one timecard is hardly sufficient evidence for a factfinder to conclude that Eldre engaged in an actual practice of unlawful, partial week shutdowns. At most, it shows only a single, isolated occurrence that does not establish an "actual practice." *See Kennedy*, 410 F.3d at 372 ("Identifying a few random, isolated, and negligible deductions is not enough to show an actual practice or policy of treating as hourly the theoretically salaried"); *see also Childers v. City of Eugene*, 120 F.3d 944, 946-47 (9th Cir. 1997) (affirming district court's conclusion that plaintiffs were exempt employees not entitled to overtime pay and that defendant was entitled to the window of corrections defense for its one-time suspension of an exempt employee in violation of the FLSA).

### IV. Significant Likelihood of Impermissible Deductions

Plaintiffs' third major claim is that Eldre maintained a policy that created a significant likelihood of pay deductions. Specifically, they cite Eldre's written policy (the "three-hour rule"), contained in the Eldre handbook for exempt employees, stating that if an exempt employee is absent for less than three hours on any given day, "there is no loss of pay," but that "once absent for more

than three (3) hours, the employee cannot and will not be allowed to come to work. The employee will not be paid for the entire day." Dkt. #183 Ex. N at 11, Ex. O at 9. Plaintiffs contend that "this policy destroys the salary basis by mandating full-days off without pay in instances where an employee is absent more than three (3) hours and has exhausted their sick, personal and vacation time." Plaintiffs' Mem. of Law (Dkt. #172) at 13.

"A finding of 'significant likelihood' pursuant to *Auer* requires the existence of a 'clear and particularized policy–one which effectively communicates that deductions will be made in specified circumstances.'" *Yourman*, 229 F.3d at 129 (quoting *Auer*, 519 U.S. at 461) (additional internal quotation marks omitted). The mere fact that an employer's written policies *permit* deductions to be made is not enough. In *Yourman*, for example, the Second Circuit, noting that there were admissions by the defendant employers that managerial employees were subject to disciplinary deductions and that, at least in rare instances, such deductions had been made, stated that "[e]ven assuming those facts to be true, the [plaintiffs] have shown only that such deductions were permitted, not that they would 'in fact be made in specified circumstances.' Therefore, the district court properly granted summary judgment on this issue" in favor of the employers. *Id. See also Ahern v. County of Nassau*, 118 F.3d 118, 122 (2d Cir. 1997) (although plaintiffs "definitively showed that their employment manual [permitted] the relevant deductions ... [t]hey did not demonstrate ... that such deductions would in fact be made in specified circumstances").

Although the matter is a close one, I find that plaintiffs here have presented sufficient facts for a jury to conclude that Eldre did maintain a policy that created a significant likelihood of impermissible deductions. The evidence is not so one-sided, however, as to *require* a finding for

plaintiffs in that regard. Accordingly, both sides' motions for summary judgment are denied as to this claim.

It is true that some courts have found no significant likelihood of unlawful deductions where there was no evidence that such deductions were in fact made. An examination of those cases, however, makes clear that the absence of actual deductions is not alone dispositive; if it were, there would be no practical distinction between the "actual practice" and the "significant likelihood" tests.

Rather, those cases typically involved policies that, on their face, simply *permitted*, rather than mandated, such deductions; where the policy was ambiguous or discretionary in that regard, the absence of actual deductions tended to show that no significant likelihood existed. *See, e.g.*, *Auer*, 519 U.S. at 462 (rejecting police officers' claim where pay deductions outlined in police department manual had never been applied to salaried employees, *and* the policy on its face did not require such deductions); *Cowart*, 213 F.3d at 266 (concluding that plaintiffs qualified as salaried employees where employer had never made a salary deduction under challenged policy, and policy could reasonably be read as applying to situations in which deductions would be lawful); *Stanley v. City of Tracy*, 120 F.3d 179, 184 (9th Cir. 1997) (disciplinary policy nominally subjecting all city personnel to suspensions of less than one week did not strip salaried employees of exempt status, where no actual suspensions were imposed on salaried employees, and policy did not effectively communicate that "any employees ... *will* be suspended in any specified circumstance"); *Michigan Ass'n of Governmental Employees v. Michigan Dep't of Corrections*, 992 F.2d 82, 86 (6th Cir. 1993) ("where the policy language is *ambiguous* and the proper interpretation is disputed, application of the policy is highly relevant") (emphasis added).

In this regard, I also note that in *Balgowan v. State of New Jersey*, 115 F.3d 214 (3d Cir. 1997), which Eldre relies upon here, the Third Circuit found that the plaintiffs, engineers employed by the state Department of Transportation ("DOT"), were not realistically subject to disciplinary deductions in their pay. The court based that finding not simply on the fact that the DOT had never enforced the disciplinary-deduction policy against any engineer, but also because the policy on its face applied to *all* DOT employees, not just engineers. Thus, the policy did not expressly mandate deductions in *engineers'* pay under any particular circumstances. The absence of any actual deductions was not itself dispositive, then, but simply "provide[d] even *stronger* evidence that the DOT's disciplinary policy is not one under which there is a 'significant likelihood' of deductions"). *Id.* at 219.[8]

In the case at bar, the three-hour rule, on its face, leaves little room for interpretation. It states, quite clearly, that "once absent for more than three (3) hours, the employee *cannot and will not be allowed to come to work. The employee will not be paid* for the entire day." (Emphasis

---

[8]With respect to the facial applicability of the policy to all DOT employees, the court cited the statement in *Auer*, 519 U.S. at 462, that on the facts of that case, "[i]f the statement of available penalties applied solely to [the plaintiff sergeants and lieutenants], matters would be different; but since it applies both to [them] and to employees who are unquestionably not paid on a salary basis, the expressed availability of disciplinary deductions may have reference only to the latter"). In other words, if the policy is not limited to salaried employees, it could be applied in a manner that would not jeopardize their exempt status.

In the case at bar, it appears that there were separate handbooks for exempt and non-exempt employees. *See* Giuliano Decl. (Dkt. #180) ¶ 9; Giuliano Depo. Tr. (Dkt. #183 Ex. G) at 84. Even if the same policy were set forth in both handbooks, then, on its face the exempt employees' handbook would seem to require that this policy be applied to salaried employees, unlike the policy in *Auer*, which was contained in a police department manual that covered all department employees.

- 23 -

added.)  Indeed, Eldre does not contend that the policy is facially ambiguous, but only that there is

no evidence that it was ever applied to salaried employees.  Again, though, that is not the test.

Nevertheless, I do not believe that plaintiffs are entitled to summary judgment on this claim.

There are factual issues concerning this claim that preclude summary judgment for either side.  *See*

*O'Donnell v. Robert Half Intern., Inc.*, 534 F.Supp.2d 173, 182 (D.Mass. 2008) ("there is a genuine

issue of material fact as to whether RHI has an actual practice or policy that creates a significant

likelihood of making improper deductions").

I note that in their memorandum of law, plaintiffs state, "As this Court has previously noted,

'[t]his policy violates the regulatory provision that salaried employees' pay cannot be docked for

absences occasioned by the employer.'"  Dkt. #172 at 13 (quoting *Scholtisek*, 229 F.R.D. at 390.

What this Court actually stated in that decision, however, was that "[p]laintiff *contends* that this

policy violates the regulatory provision that salaried employees' pay cannot be docked for absences

occasioned by the employer."  *Id.* (emphasis added).  That decision dealt with whether the action

should proceed as a collective action under the FLSA and whether a class should be certified on the

Labor Law claims.  As the Court noted in that decision, resolution of those issues does *not* entail an

inquiry into the merits of the plaintiff's claims.  *Id.* at 386, 391.  The Court certainly did not make

any finding with respect to the lawfulness of the three-hour rule, and plaintiffs' present assertion to

that effect is a complete mischaracterization of the Court's prior decision.

As stated, the three-hour rule does seem to be unequivocal that an exempt employee is

prohibited from reporting for work more than three hours late, and that the employee will not be paid

at all for a day when that occurs.  The case law in this area, however, indicates that courts may take

into account the employer's actual practices in determining whether a significant likelihood of impermissible deductions exists. The absence of actual deductions may not be dispositive of this issue, but courts do consider it as some evidence tending to show that no such likelihood exists. *See*, *e.g.*, *Cowart*, 213 F.3d at 266; *Balgowan*, 115 F.3d at 219; *see also Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 631 (6th Cir. 2009) (courts should not focus on whether written policy contains any "magic words" mandating pay deductions, but on whether "deductions are more than a mere theoretical possibility," and on whether employees are subject to deductions "as a practical matter") (internal quotation marks and alterations omitted).

In addition, Eldre has presented some evidence that the three-hour rule was in fact routinely ignored by both management and employees. Vice President for Finance Thomas Giuliano testified that "[i]t simply isn't the practice" to tell salaried employees that they cannot report to work more than three hours late, and that "we don't enforce that, they do get paid." Dkt. #183 Ex. G at 95. He conceded that the policy on its face prohibited employees from working at all on days when they planned to be out for more than three hours, but "added that it's obvious that no one listens, we're not even enforcing it ... ." *Id.* at 114.

Similarly, Lee Moss testified, "I'm familiar with [the three-hour rule], but I have never seen it done. I've never seen it practiced." Dkt. #183 Ex. H at 44. Scholtisek's supervisor Rick Whistler also testified that it was his understanding that an exempt employee could come into work after missing three hours at the beginning of the day, and that it was "very common" for employees to come in to work in the afternoon after being out all morning. Dkt. #183 Ex. I at 62, 71.

If there were no evidence at all about whether the policy was enforced, or ignored, then the absence of such evidence might not be probative of anything. Employees who were aware of the policy might simply not report to work once they had missed the first three hours of the day, and there would be no documentary evidence that the policy had been "enforced" by Eldre. In effect, the employees would have been policing themselves. *Cf. Michigan Ass'n of Governmental Employees*, 992 F.2d at 86 (observing that "[e]mployees subject to reduction in pay will, of course, attempt to avoid those reductions by juggling schedules and sacrificing non-work opportunities. Simply because a reduction in pay has never been applied does not mean that the employee has not been affected by the policy subjecting the employee to pay reductions"). There is some evidence, however, that Eldre's salaried employees understood that in practice, no such policy was enforced, which gives rise to an issue of fact about whether the employees were genuinely subject to pay deductions under the policy.

On the record before me, I conclude that there are also factual issues concerning whether the three-hour rule was "effectively communicated" to Eldre employees. It was set forth in the employee handbook, and Kaufman testified that "[e]verything in the handbook was communicated to employees by the handbook. They are told to read it." Dkt. #175-5 at 96. She also stated that employees are "told to sign that they read [the handbook]." *Id.* Similarly, Davis testified that she became aware of the three-hour rule through her "review of the handbook," because "that was [her] job, to review the handbook to become familiar with it." Dkt. #175-2 at 58. She could not recall ever having a conversation with anyone about that particular policy, however. *Id.* at 59. If in fact such a policy never was put into practice, then an issue of fact exists concerning whether such a

policy was genuinely "communicated" to the employees, in the sense that they were made to understand that such a rule was more than a mere "theoretical possibility." *Baden-Winterwood*, 566 F.3d at 631; *O'Brien v. Town of Agawam*, 350 F.3d 279, 293 (1st Cir. 2003).

For similar reasons, I conclude that, as a matter of law, Eldre is not entitled to rely on the "window of correction" defense with respect to this claim. If the jury concludes that Eldre did maintain a policy that created a significant likelihood of impermissible deductions, then Eldre may not avoid liability by invoking the window of correction defense. *See Yourman*, 229 F.3d at 128 ("the window of correction is not available if an employer ... has a policy that effectively communicates to its employees that [impermissible] deductions will be made"); *see also Takacs v. Hahn Automotive Corp.*, 246 F.3d 776, 783 (6th Cir.) ("in light of our previous determination that Hahn had ... a policy that created a significant likelihood of impermissible deductions ..., we conclude that the district court did not err in determining that Hahn failed to show that it was entitled to utilize the 'window of correction' defense"), *cert. denied*, 534 U.S. 889 (2001).[9]

---

[9]As explained in footnote 5, *supra*, the regulations were amended in 2004 to make clear that a "significant likelihood" of improper deductions is not enough to cause the employer to lose the exemption. While there is not a wealth of case law on the subject, courts have held that where the plaintiffs' claims straddle the August 23, 2004 effective date of the amendments, "the proper approach is to apply Auer's salary-basis test to pay periods occurring before August 23, 2004 and to apply § 541.603 to pay periods occurring after the same." *Baden-Winterwood*, 566 F.3d at 629. *See, e.g.*, *Monroe Firefighters Ass'n v. City of Monroe*, 600 F.Supp.2d 790, 799 (W.D.La. 2009) (applying pre-amendment regulations to plaintiffs' employment prior to August 23, 2004); *see also Reiseck v. Universal Communications of Miami, Inc.*, 591 F.3d 101, 105 n.5 (2d Cir. 2010) ("Because the language of the 2004 amendments to the relevant regulations does not require retroactive effect, we rely on the regulations as they were written" during plaintiff's employment, which ended several months before effective date of amendments).

Since the class here consists of all individuals who are or were employed by Eldre on or after December 27, 1997, *see* Dkt. #64 at 23, it appears that such an approach would be proper

(continued...)

- 27 -

## V. New York Labor Law Claims

### A. Salary Basis

In addition to their claims under the FLSA, plaintiffs also assert a claim alleging that Eldre has "fail[ed] to pay overtime as required by ... the New York Labor Law ... ." Complaint ¶ 33. The Labor Law itself does not contain any provision requiring the payment of overtime wages, although New York Department of Labor ("DOL") regulations do require that employers pay overtime "in the manner and methods provided in and subject to the exemptions of" the FLSA. 12 N.Y.C.R.R. § 142-2.2.

Plaintiffs contend that they are entitled to summary judgment on this claim, for the same reasons that they have advanced in support of their FLSA claims. In its cross-motion, Eldre argues that even if plaintiffs are entitled to summary judgment on their FLSA claims, that does not mean that they are entitled to summary judgment on their Labor Law claims, because the FLSA and the Labor Law differ in at least one material respect.[10]

---

[9](...continued)
here, although that issue is not directly before the Court at this time.

[10]This issue is significant here mainly because the statute of limitations under the federal and state laws differ. The FLSA provides a two-year statute of limitations unless the violations are willful, in which case a three-year statute of limitations applies. 29 U.S.C. § 255(a). New York Labor Law § 198(3) provides a six-year statute of limitations for wage claims.

The two statutes also differ as to the amount of damages available for willful violations. A willful violation of the FLSA's overtime provision entitles the employee to double damages, *see* 29 U.S.C. § 216(b), whereas under the Labor Law, damages for willful violations are increased by only 25 percent. *See* N.Y. Lab. L. § 663(1).

Eldre contends that in contrast to the FLSA, the Labor Law does not contain any salary basis test for determining whether an employee is exempt. To understand the significance of that issue, some familiarity with the relevant statutory and regulatory provisions is required.

As stated, the Labor Law itself does not require payment of "overtime." *See Ballard v. Community Home Care Referral Service, Inc.*, 264 A.D.2d 747, 747 (2d Dep't 1999). Section 655(5)(b), however, empowers the Commissioner of Labor to appoint a wage board, with the authority to, *inter alia*, recommend "regulations governing ... overtime or part-time rates."[11]

Pursuant to that authority, the DOL has enacted § 142-2.2 of the regulations, which provides, in pertinent part:

> An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 U.S.C. 201 et seq., the Fair Labor Standards Act of 1938, as amended ... . In addition, an employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standards Act, as amended, ... overtime at a wage rate of one and one-half times the basic minimum hourly rate.

The "basic minimum hourly rate" referred to in the last sentence is the minimum wage, which is set forth at Labor Law § 652. *See, e.g.*, *Almeida v. Aguinaga*, 500 F.Supp.2d 366, 368 (S.D.N.Y. 2007); *Manliguez v. Joseph*, 226 F.Supp.2d 377, 389 (E.D.N.Y. 2002).

The term "employee" is defined as "any individual employed, suffered or permitted to work by an employer," with certain exceptions. 12 N.Y.C.R.R. § 142-2.14(a). Insofar as is relevant to this case, the regulation exempts from the definition of "employee" anyone who works in a bona fide

---

[11]In addition, Labor Law § 193 provides that only certain enumerated "deduction[s] from the wages of an employee" are permitted, and § 663 provides for a civil action by any employee who "is paid by his or her employer less than the wage to which he or she is entitled under the provisions of this article ... ."

executive, administrative or professional capacity. In that respect, then, the Labor Law corresponds to the FLSA provision that "employee[s] employed in a bona fide executive, administrative, or professional capacity" are exempt from the FLSA's overtime requirements. 29 U.S.C. § 213(a)(1).[12]

The definitions of "executive, administrative, or professional" employees under New York law are not identical to those under the FLSA, although whether there is any practical difference between the two is disputed here. The FLSA provides that "[t]he exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. § 541.2. The New York regulations set forth definitions that, as far as the job duties are concerned, are substantially the same, if not quite identical, to those in the federal regulations.

The federal and state regulations differ with respect to the payment of a salary, however. The federal regulations concerning all three of these job categories require that the employee be compensated on a "salary basis," at a prescribed minimum rate.[13] The New York regulations do not use the term "salary basis," but they do provide that a person will not be considered to work in an executive or administrative capacity unless he "is paid for his services a salary" that meets a

---

[12]There are other classes of employees (mostly employees in certain industries) who are exempted from the FLSA overtime requirements, but who are entitled to overtime under New York law, at the rate prescribed in § 142-2.2.

[13]Under the federal regulations, a person may qualify as an administrative or professional employee if he is paid on either a "salary or fee basis ... ." 29 C.F.R. §§ 541.200(a)(1), 541.300(a)(1). *See also* 29 C.F.R. § 541.605 (defining "fee basis"). This case does not involve any issues concerning payment on a fee basis.

prescribed minimum rate.[14]  12 N.Y.C.R.R. §§ 142-2.14(c)(4)(i)(e), 142-2.14(c)(4)(ii)(d).  The

definition of "professional," however, contains no salary requirement of any kind.  *See* 12

N.Y.C.R.R. § 142-2.14(c)(4)(iii).

Based on these provision, Eldre makes several arguments.  First, Eldre argues that whereas

the FLSA regulations create an affirmative defense (*i.e.*, that the plaintiff is a professional,

administrative or executive employee) that must be pleaded and proved by the employer, the New

York exemptions form a part of the definition of "employee," and hence are a part of the plaintiffs'

burden of establishing their entitlement to overtime.  That argument, however, is not supported by

the case law, and is inconsistent with the general similarity between the application of the FLSA and

the Labor Law.  *See*, *e.g.*, *Scott Wetzel Services Inc. v. New York State Bd. of Indus. Appeals*, 252

A.D.2d 212, 214 (3d Dep't 1998) (stating that employer bears ultimate burden of establishing that

its employee falls within FLSA exemption, and applying same standards to Labor Law claim).

Second, Eldre contends that § 142-2.2 does not state *who* is entitled to overtime pay, or under

what circumstances a right to overtime exists.  Instead, Eldre says, the regulation simply specifies

the *amount* of overtime wages that must be paid to an employee who is entitled to overtime.  In other

words, the regulation states, in effect, that *if* an employee is entitled to overtime pay, that pay is to

be calculated at a certain prescribed rate.[15]  Since professionals, executives and administrators are

---

[14]The prescribed minimums differ under the federal and state regulations.  Under the 2009
federal regulations, the minimum is $455 per week.  The New York regulations in effect as of
July 24, 2009 prescribe a minimum of $543.75 per week for executive and administrative
employees.

[15]According to Eldre, that amount is 1.5 times the employee's regular pay rate for
employees who are not exempt under federal law, and 1.5 times the basic minimum hourly rate,

(continued...)

excluded from the definition of "employee," however, *see* 12 N.Y.C.R.R. § 142-2.14, § 142-2.2 simply has no application to them, according to Eldre.

That argument, in turn, has several aspects. For one thing, Eldre contends that since New York law contains no salary requirement for professionals, the Labor Law claims of those plaintiffs who fall into that category must be dismissed, regardless of whether they were paid on a salary basis.

Eldre also asserts that there is no "salary basis" test under New York law, for *any* category of exempt employees, and that even if plaintiffs do not fall within the "professional" category, they certainly fall within one of the other categories of exempt individuals, *i.e.*, executive or administrative employees. Therefore, Eldre argues, all the plaintiffs' claims must be dismissed, because plaintiffs' claims rest upon the premise that Eldre failed to pay them on a "salary basis."

Although this argument is somewhat convoluted, it appears that Eldre is arguing that even if plaintiffs are not exempt under the FLSA (because they have not been paid on a salary basis), they are still not entitled to overtime under the Labor Law. Eldre argues that regardless of whether deductions were occasionally (and, according to plaintiffs, improperly) made from plaintiffs' pay, the evidence demonstrates that plaintiffs were not literally paid by the hour, but rather that they were paid a salary. Since plaintiffs' salaries exceeded the minimums under the DOL regulations

---

[15](...continued)
*i.e.*, minimum wage, for exempt employees under federal law.

The DOL has also interpreted the regulation to mean that for an FLSA exempt employee, the reduced overtime rate should be calculated as 1.5 times the minimum wage rate, except that "where an employee's regular wages are greater than one and one-half times the minimum wage, Labor Law §§ 191 and 193 require an employer to pay the employee at least his regular rate for overtime." *Edwards v. Jet Blue Airways Corp.*, 21 Misc.3d 1107(A) (Sup. Ct. Kings County 2008).

pertaining to executive and administrative employees, all the plaintiffs were exempt under New York

law, according to Eldre, because they all fell into one of the three exempt categories.

The thrust of Eldre's argument seems to be that the FLSA's salary basis test is not the same

as simply being paid a salary.  According to Eldre's line of reasoning, the fact that a person does not

meet the salary basis test under the FLSA does not mean that the person is not paid a salary, as

required to fall within the administrative and executive exemptions under the Labor Law and its

implementing regulations.

Again, federal regulations provide that an employee will be considered to be paid on a "salary

basis" if the employee receives, each pay period, a predetermined amount that is not subject to

reduction because of "variations in the ... quantity of the work performed," or because the employee

may have missed some days or hours during a given workweek.  29 C.F.R. § 541.602(a).  If the

employer makes improper deductions from an exempt employee's salary, the employer may lose the

exemption, at least for the duration of the period in which the employee was subject to such

deductions.  29 C.F.R. §§ 541.603(a).

Apparently, Eldre takes the position that the pay deductions in the case at bar, even if

inconsistent with that federal salary basis test, do not mean that plaintiffs were not paid a "salary"

for purposes of the New York regulations.  Eldre states that "[n]o one has ever claimed in this

lawsuit that any Plaintiffs were paid by the hour," but simply "that their *salaries* were impermissibly

docked on occasion," Def. Mem. of Law (Dkt. #184) at 33-34.  Since plaintiffs' salaries exceeded

the minimums under the state regulations discussed above, Eldre contends, the plaintiffs were not,

and are not, considered "employees" for purposes of New York's overtime provision, 12 N.Y.C.R.R.

§ 142-2.2.  Thus, Eldre concludes, plaintiffs are simply not entitled to any overtime at all under New York law.

I am not persuaded by Eldre's arguments.  At the outset, I note Eldre's contention that this Court has already held, in my 2005 class certification decision, that there is no salary basis test under New York law.  That, however, is an oversimplification and a distortion of the Court's statements on that subject.

In that prior decision, the Court did state–correctly–that the New York regulations "do not use the term 'salary basis,' nor is that term (or any equivalent of the salary basis test) contained anywhere in the New York regulations."  229 F.R.D. at 392 n.7.  The Court pointed out, however, that "[t]he definitions of 'executive' and 'administrative' [in the New York regulations] do contain a requirement that the person be 'paid for his services a salary'" in a minimum weekly amount.  *Id.*

Reading these statements together, and in the broader context of the Court's decision, it is clear that the Court did not hold that there is no salary *requirement* for an overtime exemption under New York law, or that the payment of a salary is irrelevant to overtime claims under the Labor Law.  Nor, for that matter, did the Court suggest that this difference between the FLSA and the Labor Law was particularly significant; in fact, in rejecting Eldre's argument that plaintiffs' state law claims presented "novel and complex" issues of New York law, the Court stated that the absence of an explicit salary basis test in the New York Labor Law was "simply a *modest* difference between the two statutory schemes, which–as a number of courts have observed–are otherwise quite similar if not identical."  *Id.* at 392 (emphasis added).

All that the Court said, then, is that the Labor Law, unlike the FLSA, does not set forth any detailed criteria for a salary basis "test." As the Court recognized, however, by its terms the Labor Law expressly requires that an individual will not be considered to work in an executive or administrative capacity unless he "is paid ... a salary ... ." *See id.* at 392 n.7. The question, then, is whether the Labor Law's salary requirement for administrative and executive employees is substantively different from the FLSA's salary basis test. I conclude that it is not, at least insofar as is relevant to the instant case. I thus am unpersuaded by Eldre's argument that even if the federal salary basis test has not been met here, plaintiffs still do not fall within the definition of employees under the Labor Law, in part because they were paid a "salary," irrespective of whether partial day deductions were occasionally made from their salaries.

Even assuming *arguendo* that the federal regulation concerning the salary basis test is not controlling with respect to whether an employee is considered to be paid a "salary" under state law, the criteria set forth in the federal regulation–*i.e.*, regularly receiving each pay period a predetermined amount of compensation that is not subject to reduction based on the quality or quantity of the work performed–seem to be entirely consistent with the commonly understood meaning of the word "salary." Although the federal regulation goes on to set forth in some detail various specific circumstances under which deductions are allowable, this general formulation of the salary basis test is simply an explanation of what it means to be paid a salary as opposed to an hourly wage.

This conclusion finds support in *Torres v. Gristede's Operating Corp.*, No. 04 CIV. 3316, 2006 WL 2819730, at *13 (S.D.N.Y. Sept. 29, 2006). In that case, the district court stated that

because "the New York implementing regulations do not define 'salary,'" as that term is used in the Labor Law, the court would follow the directive of the New York Court of Appeals in *Orens v. Novello*, 99 N.Y.2d 180, 185-86 (2002), that "[i]n cases where the term at issue does not have a controlling statutory definition, courts should construe the term using its usual and commonly understood meaning." 2006 WL 2819730, at *13. Noting that "[t]he *Orens* court then looked to dictionary definitions for assistance," *id.* (citing *Orens*, 99 N.Y.2d at 186), the court in *Torres*, after consulting dictionary definitions of "salary," concluded that for purposes of the New York Labor Law and its implementing regulations, "'salary' means receipt of fixed, regular compensation (*i.e.*, not subject to weekly variation by hours worked)." *Id.*

That definition seems sound, and I adopt and agree with the *Torres* court's reasoning in this regard. I also find, for the reasons stated above with respect to plaintiffs' FLSA claims concerning partial day deductions, that plaintiffs were not always paid a salary as required for them to fall within the executive or administrative exemptions under New York law. The law is clear that an employer cannot avoid liability for overtime simply by classifying employees as exempt, salaried employees, but then paying them in fact on an hourly basis. *See Archibald v. Marshalls of MA, Inc.*, No. 09 CV 2323, 2009 WL 3817404, at *2 (S.D.N.Y. Nov. 12, 2009) (denying motion to dismiss Labor Law claim alleging that employer misclassified class member as exempt employees and therefore unlawfully denied them overtime pay); *Bongat v. Fairview Nursing Care Center, Inc.*, 341 F.Supp.2d 181, 187 (E.D.N.Y. 2004) ("Since [due to reductions in their pay having been made based on the number of hours they worked] plaintiffs were not always paid a salary of at least [the

threshold amount under the Labor Law exemptions for executive or administrative employees], defendant cannot show that they are exempt" under those two categories).

This result is also in keeping with the remedial nature of the Labor Law, and the implementing regulations setting forth the overtime requirements. *See Settlement Home Care, Inc. v. Industrial Bd. of Appeals of Dep't of Labor*, 151 A.D.2d 580, 581 (2d Dep't 1989) (New York's Minimum Wage Act, pursuant to which overtime regulations have been promulgated, constitutes remedial legislation); *see also Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (noting the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes"); *Rizzo v. New York State Div. of Housing and Community Renewal*, 6 N.Y.3d 104, 114 (2005) ("When faced with the application of a remedial statute, we must give it liberal construction to carry out the reform intended and to spread its beneficial results as widely as possible").

Finally, this result comports with the DOL's apparent intent that the New York overtime regulations, and particularly the exemptions, be applied and construed in a manner consistent with the analogous provisions under the FLSA. *See* 12 N.Y.C.R.R. § 142-2.2.[16] *See Reiseck v. Universal Communications of Miami, Inc.*, 591 F.3d 101, 105 (2010) ("The [New York Labor Law] ... mandates overtime pay and applies the *same exemptions* as the FLSA") (emphasis added); *Bennett v. Progressive Corp.*, 225 F.Supp.2d 190, 215 (N.D.N.Y. 2002) ("Because neither plaintiffs nor defendants direct this court to authority mandating a different analysis [of plaintiffs' claims for

---

[16]Section 142-2.2 provides generally that employers must pay their employees overtime "in the manner and methods provided in and subject to the exemptions of" the FLSA, except for the exemptions set forth in § 13(a)(2) and (4) of the FLSA. Those two subsections of the FLSA (which dealt with employees of certain retail or service establishments) were repealed in 1989, however. *See West v. City of Ft. Pierce, Florida*, No. 07-14335, 2008 WL 3270849, at *4 (S.D.Fla. Aug. 8, 2008).

overtime compensation] under New York State law and the FLSA, the ensuing analysis focuses solely on federal law, but applies equally to Plaintiff's claims under the FLSA and New York State law") (internal quote omitted).

Indeed, in an opinion letter dated March 30, 2006 (a copy of which has been submitted by plaintiffs), the DOL stated that "the only alternative to an interpretation that 'salary' [as used in the state regulations] is the same as 'salary basis' [as used in the federal regulations] would be to interpret the former term" as meaning the same thing as "'wages' as set forth in the New York State Labor Law § 190(3)," a view that the DOL rejected. Reasoning that "if the drafters of the regulations had intended 'salary' to be the equivalent of 'wages,' they would have used the already-defined term 'wages' and avoided any confusion," the DOL concluded that "'salary' means something other than 'wages,' to wit: compensation paid in an unvarying, predetermined amount." Dkt. #189-4 at 55.

Under both federal and New York law, an agency's interpretation of its own regulations is entitled to some deference, particularly if there is any ambiguity in the regulation. *See*, *e.g.*, *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 207 (2d Cir. 2009) ("we will generally defer to an agency's interpretation of its own regulations, ... so long as the interpretation is not plainly erroneous or inconsistent with law"); *Torres v. Ridgewood Bushwick Senior Citizens Homecare Council Inc.*, No. 08-CV-3678, 2009 WL 1086935, at *4 (E.D.N.Y. Apr. 22, 2009) ("When an opinion letter interprets the agency's own regulation, ... it is entitled to deference, so long as the regulation in question is ambiguous") (citing *Auer*, 519 U.S. 452); *LMK Psychological Services, P.C. v. State Farm Mut. Auto. Ins. Co.*, 12 N.Y.3d 217, 223 (2009) ("We have long held that the Superintendent[ of Insurance]'s 'interpretation [of an insurance regulation], if not irrational or

unreasonable, will be upheld in deference to his special competence and expertise with respect to the insurance industry, unless it runs counter to the clear wording of a statutory provision'") (quoting *Matter of New York Pub. Interest Research Group v New York State Dept. of Ins.*, 66 N.Y.2d 444, 448 (1985)).

Federal courts have accorded such deference to DOL opinions interpreting New York labor regulations. *See*, *e.g.*, *Almeida v. Aguinaga*, 500 F.Supp.2d 366, 370 (S.D.N.Y. 2007) (concurring with DOL's interpretation of regulation concerning "spread of hours" compensation); *Seenaraine v. Securitas Sec. Services USA, Inc.*, 37 A.D.3d 700, 701-02 (3d Cir. 2007) (stating that DOL's interpretation of particular regulation "is neither unreasonable nor irrational, nor is it in conflict with the plain meaning of the promulgated language. Thus, it is entitled to deference"). *See also Roberts v. Ground Handling, Inc.*, 499 F.Supp.2d 340, 353 (S.D.N.Y. 2007) (noting that United States DOL had issued opinion letter concerning manner in which to determine an employee's eligibility for leave under certain circumstances, and stating that "[s]uch opinion letters are normally accorded great deference") (citing *Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 47 & n. 1 (2d Cir. 2002)).

I conclude, therefore, that plaintiffs are entitled to summary judgment on their Labor Law claims, to the same extent as, and for the reasons stated with respect to, their claims under the FLSA relating to deductions for partial day absences, but with one exception, which is discussed next. As with the analogous FLSA claim, a determination of plaintiff's damages will have to await further proceedings.

**B. Professional Exemption**

Eldre argues that even if the Court were to find that the salary basis test applies under New York law, the Labor Law claims of forty-three class members should be dismissed on the ground that those class members, as a matter of law, fall within New York's "professional" exemption, for which there is no salary requirement of any kind.[17] In support of that assertion, Eldre has submitted a declaration of Vice President for Finance Thomas Giuliano (Dkt. #180) in which he describes the duties and requirements of the jobs held by those forty-three class members. Defendants have also submitted personnel records of some of those individuals, including their resumés and Eldre job applications, as well as some job descriptions from Eldre's files. Dkt. #183, Exs. T, U.[18]

_____

[17]Section 142-2.14(c)(4)(iii) of the New York regulations provides that

(iii) Professional. Work in a bona fide ... professional capacity means work by an individual:

(a) whose primary duty consists of the performance of work: requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes; or original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination or talent of the employee; and

(b) whose work requires the consistent exercise of discretion and judgment in its performance; or

(c) whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical or physical work) and is of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

[18]Giuliano states that the job descriptions from Eldre's files "are somewhat outdated
(continued...)

As Giuliano explains, Eldre is in the business of manufacturing "bus bars" (which are devices that transmit electrical power), and related devices that incorporate bus bars. Giuliano Decl. ¶¶ 4-6. Giuliano's description of the jobs at issue, most though not all of which are in engineering, goes on for some twenty-four paragraphs, and will not be repeated at length here. In general, however, he states that for each of these positions, Eldre requires a degree (such as a B.S. in engineering) or, in some cases, equivalent training and experience. Giuliano also explains how an employee in one of these positions would utilize his education, training and experience on the job in order to make decisions or recommendations concerning various technical matters. Giuliano Decl. ¶¶ 24-65.

In response, plaintiffs contend, first, that Eldre's submissions concerning this issue are flawed because they do not address whether any of these employees also fell within the "administrative" or "executive" exemptions. Plaintiffs argue, without citing any authority, that "[i]f persons fall within those exemptions, the New York Labor Law clearly bars Eldre from docking their salaries." Plaintiffs' Reply Mem. (Dkt. #188) at 19.

That is not in fact what the Labor Law or its implementing regulations state. The relevant regulation, 12 N.Y.C.R.R. § 142-2.14, states that the term "employee," for purposes of the overtime regulations, "means any individual employed ... by an employer, except" for certain categories of persons, including "any individual permitted to work in, or as [an] [e]xecutive, administrative *or* professional capacity ... ." (Emphasis added.) Since that exclusion is phrased in the disjunctive, under well-established canons of statutory construction, the effect of falling into any *one* of those

---

[18](...continued)
and/or general," and not as detailed or current as the descriptions he provides in his declaration. Dkt. #180 ¶ 26.

categories is sufficient to exclude the individual in question from the definition of "employee," and hence from the scope of the overtime regulations. *See*, *e.g.*, *NLRB v. KDFW-TV, Inc.*, 790 F.2d 1273, 1277 (5th Cir. 1986) (definition of "supervisor" in National Labor Relations Act "is to be read in the disjunctive, with the existence of any one of the statutory powers sufficient to confer supervisory status"). The regulation is not written in such a way that it prohibits employers from docking the pay of persons who fall within any of the three enumerated categories, but rather to put such persons outside the class of persons who are entitled to overtime.

Plaintiffs also contend that even from the limited standpoint of analyzing the "professional" exemption, Eldre's submissions fall short of what is necessary to establish that the forty-three class members in question fall within the exemption. In support of that argument, plaintiffs note that "[t]here is no testimony from any affected employees or their immediate supervisors as to what duties they were in fact performing ... ." Plaintiffs' Reply Mem. (Dkt. #188) at 22.

When a party moving for summary judgment has presented evidence that "demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (quoting *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993). "If the nonmovant fails to meet this burden, summary judgment will be granted against it." *Id.* (quoting *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). *Accord Pepsico, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

In the case at bar, Eldre has presented admissible evidence, in the form of an affidavit of one of its corporate officers, indicating that the forty-three class members at issue here fall within the "professional" exemption under the Labor Law. To successfully oppose Eldre's motion with respect to the Labor Law claims of those plaintiffs, plaintiffs must do more than simply rest on their pleadings. Under the well-established principles recited above, plaintiffs must rebut Eldre's evidence with evidence of their own, showing that there is a genuine issue of fact for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009); *Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006).

While plaintiffs point out that Eldre has not submitted any testimony from the employees themselves, the fact remains that Eldre has presented evidence that the plaintiffs at issue should be considered "professional" under New York law. That evidence stands unrebutted. If plaintiffs believe that the employees' testimony would demonstrate otherwise, it was certainly within their power to submit affidavits of their own, rebutting Eldre's proof in this regard. Since they have failed to do so, I conclude that Eldre is entitled to summary judgment with respect to the Labor Law claims of these forty-three plaintiffs. *See Nichols v. Hurley*, 921 F.2d 1101, 1111 (10th Cir. 1990) (district court did not err in entering summary judgment in favor of employer, where employer made a sufficient showing to demonstrate that plaintiff sheriff's deputies fell within the "personal staff" exemption from FLSA overtime requirements, and plaintiffs' affidavits failed to demonstrate that a material issue of fact existed as to whether their relationship with the sheriff actually was such as to fall within the exemption); *cf. Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1463-64 (10th Cir. 1996) (concluding that issues of fact existed concerning whether plaintiff fell within FLSA's

professional exemption, in part based on plaintiff's affidavit describing the nature of his actual job duties); *Talbott v. Lakeview Center, Inc.*, No. 06cv378, 2008 WL 4525012, at *8 (N.D.Fla. Sept. 30, 2008) (denying summary judgment for both sides where "[e]ach of the parties support[ed] its position with record evidence ... with respect to whether plaintiffs possess[ed] 'advanced knowledge' within the meaning of the learned professional exemption"); *Sandoval v. Sconet, Inc.*, No. 05-cv-3065, 2006 WL 3499520, at *4 (S.D.Tex. Dec. 5, 2006) (parties' "contradictory declarations" concerning plaintiff's primary duty gave rise to genuine issue of fact regarding plaintiff's exemption as a "computer professional").[19]

## VI. Other Matters

Eldre contends, and plaintiffs do not appear to dispute, that certain plaintiffs' claims should be dismissed on various grounds. For example, pursuant to the parties' stipulation, the Court previously ordered that eight individuals would not receive notice of this action, and would be excluded from both the FLSA collective action and the Labor Law class action. Dkt. #67. One of those eight individuals, Stephanie Wright, nevertheless submitted an opt-in form by which she indicated her intent to opt into the FLSA portion of this case. Dkt. #84. Plaintiffs appear to concede that Wright's claim is subject to dismissal. *See* Plaintiffs' Response to Defendant's Rule 56.1 Statement (Dkt. #190) ¶ 2. Plaintiff Wright's claim is therefore dismissed.

There is also an issue regarding the appropriate statute of limitations on plaintiffs' FLSA claims. "The FLSA generally provides for a two-year statute of limitations on actions to enforce its

---

[19]The Court's conclusion in this regard has no effect on plaintiff's FLSA claims, since the FLSA's salary basis test applies to all three categories of exempt employees.

provisions, but allows a three-year limitations period for 'a cause of action arising out of a willful violation.'" *Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999) (quoting 29 U.S.C. § 255(a)).

Defendant asserts that the claims of fourteen opt-in plaintiffs must be dismissed because they filed their claims more than three years after their employment at Eldre terminated. While not explicitly conceding that those plaintiffs' claims must be dismissed, plaintiffs have admitted that those individuals' claims were filed more than three years after they left Eldre. *See* Dkt. #190 ¶ 5. Plaintiffs have offered no reason why those plaintiffs' claims should not be dismissed as untimely, and accordingly, they are dismissed, as set forth in the Conclusion of this Decision and Order.[20]

Eldre has identified two plaintiffs, Robert Compson and John Lundberg, who Eldre states were reclassified from exempt to non-exempt status more than three years before they filed their claims. *See* Def. Rule 56.1 Statement (Dkt. #183) ¶¶ 6, 7; Giuliano Decl. ¶¶ 13, 19; Def. Ex. Q. In response, plaintiffs simply "[d]eny sufficient knowledge ... as to whether [Compson or Lundberg] was paid on an hourly basis after he was reclassified as non-exempt." Dkt. #190 ¶¶ 6, 7.

In the face of defendant's evidence, it is not enough for plaintiffs simply to deny knowledge concerning these matters. *See Ward v. CSX Transp., Inc.*, No. CIV. 98-0918, 1999 WL 1473622, at *2 (S.D.Ala. Sept. 20, 1999) (granting summary judgment for defendant on plaintiff's Title VII claim where, in his response to defendant's motion, plaintiff stated only that he "d[id] not have knowledge to admit or deny" defendant's factual assertions); *General Ins. Co. of America v. Eastern*

---

[20]As stated, the statute of limitations under the New York Labor Law is six years, and it does not appear that any of plaintiffs' Labor Law claims in this case would be subject to dismissal as untimely. *See Park v. Seoul Broadcasting System Co.*, No. 05CV8956, 2008 WL 619034, at *7 n.12 (S.D.N.Y. Mar. 6, 2008).

*Consol. Utilities, Inc.*, Civ. A. No. 94-CV-4388, 1995 WL 428685, at *7 (E.D.Pa. July 18, 1995) (stating, with respect to defendants' apparent "belief ... that [their] statements alleging a lack of knowledge are sufficient to defeat the [plaintiff's] motion for summary judgment," that "[t]his is not an uncommon delaying tactic, but ... to defeat a motion for summary judgment, the non-moving party may not rest on 'mere denials'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986)). Accordingly, the FLSA claims of plaintiffs Compson and Lundberg are dismissed as well.

Defendant has also identified nine plaintiffs whose claims were filed more than two years, but less than three years after their Eldre employment came to an end. Thus, these plaintiffs' FLSA claims would be timely only if Eldre were found to have willfully violated the FLSA.

Although defendant has not moved to dismiss these claims on timeliness grounds, plaintiffs have moved for summary judgment on the issue of willfulness. Plaintiff's motion is denied. While I recognize that plaintiffs have submitted some evidence that complaints were made to management about certain practices at Eldre concerning some of the matters at issue in this lawsuit, viewing the entire record in the light most favorable to Eldre, the Court cannot determine as a matter of law whether any FLSA violations here, if proven, were willful.

As stated, there is some evidence that Eldre officers had been made aware that some of the policies at issue here were of questionable legality under the FLSA. *See*, *e.g.*, Davis Depo. Tr. (Dkt. #183 Ex. K) at 44-45. There is also evidence, however, that those officers had taken steps to ensure, and were operating under a good-faith belief, that their payroll policies were in compliance with all applicable laws. Resolution of the issue of willfulness therefore remains for the trier of fact. *See*, *e.g.*, *Reynolds v. City of Jacksonville*, No. 308-CV-388, 2009 WL 5067799, at *8 (M.D.Fla. Dec.

16, 2009) ("Whether the City through its agents either knew that its conduct was prohibited by the FLSA or showed reckless disregard about that possibility presents a genuine issue of material fact which must be decided by the fact finder"); *Coppage v. Bradshaw*, 665 F.Supp.2d 1361, 1365 (2009) (stating that the "evidence creates a genuine issue of fact as to whether Bradshaw willfully violated the FLSA and precludes summary judgment for Bradshaw on statute of limitations grounds"); *Ramirez v. Rifkin*, 568 F.Supp.2d 262, 268 (E.D.N.Y. 2008) ("because there are disputed issues of fact with respect to willfulness, defendants' attempt to obtain summary judgment on this [statute of limitations] issue is denied").

## CONCLUSION

Plaintiffs' motion for summary judgment (Dkt. #171) is granted in part and denied in part. Plaintiffs are granted summary judgment with respect to the issue of liability on their claims under the Fair Labor Standards Act ("FLSA") and the New York Labor Law based on Eldre's practice of docking nominally exempt employees' pay for partial day absences. Determination of the damages or other relief available to plaintiffs must await further proceedings. In all other respects, plaintiffs' motion is denied.

Defendant's cross-motion for summary judgment (Dkt. #179) is granted in part and denied in part. Defendant is granted summary judgment with respect to plaintiffs' claims under the FLSA and the New York Labor Law based on Eldre's alleged practice of docking nominally exempt employees' pay for partial week absences attributable to plant shutdowns, and those claims are dismissed.

All of the FLSA claims of plaintiffs Robert Compson, Herve Dauvergne, Stephen Davis, Gary Del Regno, Sarah Devivi, Bradley Fisher, Ronald Gostomski, Cynthia Harding, Brian Kelly, Carol Lucisano, John Lundberg, Laura Macomber, James Nemo, Steve Ott, Michael Rathbun, Theresa Sanger, and John Willis are dismissed in their entirety as time-barred.

All of the New York Labor Law claims of the following class members are dismissed, on the ground that these class members fall into the "professional" exemption from the Labor Law's overtime requirements: Joseph Arieno, Craig Bader, Frank Battaglia, Lee Begy, Jon Beresniewicz, Donald Brown, Franklin Bulley, Jeffrey Bye, Wayne Calhoun, Edward Compson, Shane Czerkas, Herve Dauvergne, Steven Davis, Gary Del Regno, Brian Devito, Russell Erickson, Robert Flight, Ronald Gostomski, Richard Huber, Cyril Kastner, William Kastner, Brian Kelly, Sanjeer Khurana, John Knapp, John Lundberg, Kevin Madigan, Eugene McMaster, Donna Mandell, Steve McGarrity, Jeffrey McIlmoyle, Paul Murkett, James Nemo, Kevin O'Neill, Royal Piper, Victor Raguso, Ronald Reis, Michael Rick, Michael Scarcelli, Gerald Totten, Jasher Usher, Robert Van Horn, Michael Whitney, and John Willis.

All of the claims of Stephanie Wright are dismissed.

In all other respects, defendant's motion is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       March 22, 2010.